**UNITED STATES BANKRUPTCY COURT
DISTRICT OF MASSACHUSETTS
EASTERN DIVISION**

| | |
|---|---|
| In re: | |
|    NORGATE METAL INC., | Chapter 15 |
|         Debtor in a Foreign Proceeding. | Case No. 11-_____ |

**DECLARATION IN SUPPORT OF ERNST & YOUNG INC.'S:
(i) PETITION FOR RECOGNITION OF CANADIAN PROCEEDING UNDER
11 U.S.C. § 1515; AND (ii) *EX PARTE* MOTION FOR PROVISIONAL RELIEF
PURSUANT TO §§ 105(A) AND 1519 OF THE BANKRUTPCY CODE
AND REQUEST FOR HEARING**

Luc Poulin, pursuant to 28 U.S.C. § 1746, hereby declares under penalty of perjury under the laws of the United States, as follows:

1.    I am a Partner of Ernst & Young Inc. ("E&Y"), a corporation organized and existing under the laws of Canada.

2.    I make this Declaration in support of E&Y's: (i) Petition for Recognition of Canadian Proceeding Under 11 U.S.C. § 1515; and (ii) *Ex Parte* Motion for Provisional Relief Pursuant to §§ 105(A) and 1519 of the Bankruptcy Code and Request for Hearing.

**BASIS FOR THE MONITOR'S KNOWLEDGE OF THE DEBTOR**

3.    The information contained in this Declaration regarding the Debtor (defined below) is based upon information reflected in the Debtor's un-audited books and records, including, but not limited to, their interim financial statements for the eleven month period ending on September 30, 2011.  This Declaration is also based upon the orders entered in the Canadian Proceeding (defined below).

## THE CANADIAN PROCEEDING

4.      On November 22, 2011, the Quebec company Norgate Metal Inc. (the "Debtor")
filed a Petition for the Issuance of an Initial Order Pursuant to Sections 4, 5, and 11 of the
*Companies' Creditors Arrangement Act* (R.S.C., 1985 c. C-36) with the Quebec Superior Court
(Commercial Division) (the "Canadian Court"). The Debtor's proceedings before the Canadian
Court are referred to herein as the "Canadian Proceedings."

5.      Thereafter, on November 23, 2011, the Canadian Court issued its Initial Order
(the "Initial Order") pursuant to Sections 4, 5 and 11 of Canada's *Companies Creditors
Arrangement Act*, R.S.C. 1985, c. C-36, as amended (the "CCAA"). A copy of the Initial Order
is attached hereto as Exhibit A.

6.      Pursuant to Paragraph 28 of the Initial Order, E&Y was appointed the Debtor's
Monitor under Subsection 11.7 of the CCAA and was authorized by the Canadian Court to act as
the foreign representative of the Debtor in any proceeding outside of Canada. Thus, E&Y is the
Debtor's foreign representative in the United States within the meaning of 11 U.S.C. § 101(24)
and complies with 11 U.S.C. § 1517(a)(2).

7.      Pursuant to Paragraph 57 of the Initial Order, E&Y was specifically authorized,
with the consent of the Debtor, to apply to this Court for recognition of the Initial Order and to
seek this Court's assistance in carrying out the terms of the Initial Order and any subsequent
orders of the Canadian Court. The Debtor has executed a Consent to Commencement of
Chapter 15 Case, which is attached hereto as Exhibit B.

8.      The Canadian Proceeding is a judicial proceeding under Canadian law relating to
insolvency or the adjustment of debt in which the assets of the Debtor are subject to the control
and supervision of the Canadian Court for the purpose of reorganization or liquidation.

Accordingly, I believe the Canadian Proceeding is a "foreign proceeding" within the meaning of 11 U.S.C. § 101(23).

9.     To the best of my information and belief, other than this case, the Canadian Proceeding is the only insolvency proceeding of any kind pending for the Debtor and thus is the only "foreign proceeding" with respect to the Debtor within the meaning of 11 U.S.C. § 101(23).

10.     The Initial Order protects the Debtor and/or its property (wherever located) from unilateral action by creditors. E&Y seeks comparable protections with respect to potential creditor actions and interference with property of the Debtor located in the United States.

## THE DEBTOR

11.     The Debtor is a corporation governed by the Business Corporations Act, R.S.Q., ch. S-31.1, engaged in the engineering, manufacturing and installation of steel based metal structures and related metal work products. It currently employs approximately eighty (80) people primarily at its principal place of business and manufacturing facilities in the city of La Guadeloupe, Quebec, Canada and maintains administrative offices in St. Georges, Quebec, Canada. Thus, all of the Debtor's administrative and manufacturing operations are performed in Canada. Additionally, approximately 20% of Debtor's sales and installation business is performed in Canada.

12.     The Debtor has its registered offices in the city of Saint-Georges, Quebec, but its center of main interest and operations are conducted from its manufacturing facilities located in the city of La Guadeloupe, Quebec, Canada. Specifically:

   a. The Debtor's mailing address is 9200, 22nd Avenue, Saint-Georges, Quebec, Canada G5Y-7R6;

   b. Richard Gilbert is the Debtor's sole director and is a resident of Canada;

- 3 -

c. All decision-making and control of the Debtor takes place at the Debtor's principal place of business in Quebec;

d. The Debtor's principal banking arrangements are conducted in Quebec through Distnet Canada;

e. The book value of the Debtor's Canadian long term assets is $4,200,000.00 (Canadian Dollars)(approximately $ 4,041,037.99 in U.S. Dollars); and

f. All administrative functions including accounting, financial reporting, budgeting and cash management are conducted in Quebec and all of the employees who perform such functions are situated in Quebec.

13. The Debtor supplies and installs material at both low rise and complex projects requiring between 50 and 4,000 tons of steel. Its business is segmented into two (2) broad categories:

a. <u>Engineering, manufacturing and installation of steel based metal structures:</u> The Debtor provides engineering, manufacturing and installation of steel based metal structures pursuant to drawings prepared by the architects and engineers for a variety of industrial, commercial and institutional purposes.

b. <u>Engineering, manufacturing and installation of steel based metal structure related products</u>: The Debtor also provides services for existing structures which require the engineering, manufacturing and installation of steel based metal products in existing structures, such as stairs, protective structures and garage doors. These services account for approximately 2% of Norgate's revenue.

## THE FINANCIAL DIFFICULTIES OF THE DEBTOR

14. In November 2010, the Debtor entered into an agreement with Aurora Contractors Inc., a general contractor, pursuant to which it was to manufacture and install steel based metal structure in the construction of a warehouse located in New York State, a market the Debtor had decided to explore to increase business opportunities (hereinafter the "Aurora Agreement").

- 4 -

15.   The Debtor expected that the Aurora Agreement would yield a gross profit of approximately $510,000.00 and a net profit of approximately $270,000.00.

16.   The installation of the steel based metal structure was subcontracted to Northstar Erectors, Inc. (hereinafter "Northstar") as agreed at the time the contract was awarded to the Debtor (hereinafter the "Northstar Agreement").

17.   Just a few days before the scheduled start of the Debtor's work, Northstar informed the Debtor that it could not perform its subcontract given its serious financial difficulties.

18.   The Debtor then had to rapidly replace Northstar by entering into an agreement with Structure Dereck International Inc. (hereinafter "SD") pursuant to which it essentially subcontracted the installation of the steel based metal structure for the Aurora Agreement, in replacement of Northstar (hereinafter the "SD Agreement").

19.   The amounts payable by the Debtor for the installation of the steel based metal structure pursuant to the Aurora Agreement increased from $1.4M pursuant to the Northstar Agreement to $3.25M to date pursuant to the SD Agreement, resulting in a loss of at least $1,850,000 for the Debtor.

20.   Furthermore, the amount of steel required to complete the metal structure as per the Aurora Agreement was underestimated by the Debtor resulting in a further loss of $600,000 for the Debtor.

21.   As such, pursuant to the Aurora Agreement, the Debtor incurred a loss of at least $2,450,000.

22.   Additionally, between January 2010 and April 2011, the price of steel increased from approximately $120 per metric ton to $135 per metric ton, and the value of the Canadian

currency compared to the American currency increased from approximately $0.95 to approximately $1.05.

23.    Typically, a period of between three (3) to nine (9) months elapses between the moment where Debtor is informed that its tender is accepted by the client and the moment where the Debtor begins the performance of the work in accordance thereof.

24.    It is during that crucial period that the Debtor is most vulnerable to the fluctuations related to the steel price and/or the currency, as its revenues are crystallized but its expenses have yet to be incurred and thus remain subject to fluctuations.

25.    During the fifteen (15) month period comprised between January 2010 and April 2011, the price of steel increased of approximately 13% and the Canadian currency appreciated itself with regard to the American currency of approximately 11%.

26.    These sharp increases hindered the Debtor's ability to derive a profit from its operations as steel is the raw material at the core of the Debtor's business.  Approximately eighty (80%) percent of the Debtor's revenues are derived from sales on the American market, which are paid in American currency, while approximately fifty (50%) percent of its expenses are paid in Canadian currency.  As such, the appreciation of the Canadian currency and the corresponding depreciation of the American currency significantly reduced Debtor's revenues, while at the same time increasing its expenses.

27.    The Debtor estimates that the combined effects of the sharp increase in the price of steel, the strength of the Canadian currency and the corresponding depreciation of the American currency have resulted in a loss of approximately $2,000,000 since January 2011.

28.    As is typical in the construction industry, the Debtor's obligations under its construction contracts must often be guaranteed by a bonding insurance company which

guarantees the timely execution of the Debtor's obligations in favor of its client as well as the payment of the labor and materials supplied to the project.

29.   Since 2004, for its American clients, the Debtor's bonding insurer has been La Garantie.

30.   On June 22, 2011, La Garantie informed the Debtor in writing that it would not bond new projects (although bonds remain in force on existing projects) pending the receipt of the latest audited financial statements.

31.   Despite having been provided with the 2010 Financial Statements, La Garantie has yet to reactivate the Debtor's coverage for new projects.

32.   Despite its best efforts, the current financial situation of the Debtor has made it difficult to secure an alternative bonding company for projects in the Untied States, which significantly hinders the debtor's ability to bid on new projects.

### THE DEBTOR'S U.S. PROPERTY AND ASSETS

33.   The Debtor's business is mainly oriented in the American market, from which it derives approximately 90% of its revenues.

34.   Approximately eighty (80%) percent of the Debtor's sales and installation business is performed in the United States. The Debtor's U.S. assets consist of contracts for the manufacturing and installation of steel structures at construction sites in New England (the "U.S. Contracts").

### THE DEBTOR'S U.S. CREDITORS

35.   The Debtor's un-audited books and records, including its interim financial statements as of September 30, 2011, reflect that the Debtor's U.S.-based creditors are less than one-quarter of the Debtor's total creditors. Specifically,

a.  The Debtor has five (5) secured creditors and one-hundred sixty-eight (168) unsecured creditors who are located in Canada. (See Exhibits C and D);

b.  The Debtor has just forty-one (41) unsecured U.S. creditors. The names of these creditors, their addresses, as well as the amount of indebtedness by Debtor are set forth on Exhibit D hereto. Of the forty-one (41) unsecured U.S. creditors, eighteen (18) are bonded and thirteen (13) are not bonded.

## THE RELIEF SOUGHT IS NECESSARY

36.     If creditors or other parties-in-interest interfere with the Debtor's assets, property or proceeds thereof located in the United States (the "U.S. Property"), including the Debtor's U.S. Contracts, as defined above, the Canadian Proceeding will be disrupted as the continuation and payment of those contracts performed in the United States is integral to the Debtor's business plan. Any disruption or interference with the Debtor's U.S. Property including its U.S. Contracts would cause irreparable harm to the Debtor, its creditors and other parties-in-interest in the Canadian Proceeding. Even the threat of disruption, as well as the legal cost of defending such actions, would have a severe and adverse impact on the Canadian Proceeding.

37.     Absent provisional relief pending this Court's determination with respect to the relief sought by the Petition, U.S. creditors may seek tactical advantage through unilateral action, including acceleration of efforts to commence litigation, cancellation of contracts, set offs, withholding payment, or other legal process in whatever U.S. jurisdiction the creditor may choose. In addition, creditors may use U.S. litigation or unilateral action to avoid participation in the Canadian Proceeding, whose success depends upon the ability to adopt a unified plan covering the claims of all creditors.

38.     As the Canadian Court has already issued the Initial Order prohibiting the continuation or commencement of any action against the Debtor's assets, rights and undertakings

wherever located and prohibiting actions affecting the Debtor's business operations and activities, prohibiting interference with the Debtor's U.S. Property including its U.S. Contracts will prevent conflict with the Canadian Proceeding.

## CONCLUSION

39.    In light of the foregoing, it is respectfully requested that the Court grant the Petition, and, pending the Court's ruling on the Petition, grant the provisional relief requested in E&Y's *Ex Parte* Motion for Provisional Relief Pursuant to §§ 105(A) and 1519 of the Bankruptcy Code and Request for Hearing.


I certify pursuant to 28 U.S.C. § 1746 under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on this 21 day of December, 2011
At Quebec, Canada

Luc Poulin
Partner
Ernst & Young Inc., in its capacity
As Monitor and foreign representative of the Debtor